IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 1:10cr34-MEF |
| | ) | |
| MARIA GUADALUPE | ) | |
| MIRANDA-GARCIA and | ) | |
| LEONEL MENDOZA | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

This case is before the court on co-defendants Maria Guadalupe Miranda-Garcia and

Leonel Mendoza's motions to suppress (Doc. ## 74, 77). The court heard evidence on the

motions on August 4, 2010.  For the reasons set out below, the motions to suppress are due

to be denied.

**Facts**

Co-defendants Miranda-Garcia and Mendoza are husband and wife. They contend that

the March 25, 2010, stop of their vehicle by Alcohol Beverage Control (ABC) agent Chris

Inabinett in Chancellor, Alabama, violated the Fourth Amendment to the United States

Constitution. Defendants maintain that evidence seized subsequent to the stop should be

suppressed as the "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471,

484 (1963).

At the time of the stop, agent Inabinett, who had prior experience in narcotics

investigation, was working with Drug Enforcement Administration (DEA) agents on the

investigation of an alleged drug trafficking organization in the Enterprise-Chancellor area.

DEA agent Neill Thompson, stationed in Montgomery, Alabama, was in charge of the

investigation. Dothan Police Department investigator Andy Martin, who was attached to the DEA task force, was also involved in the investigation, and Inabinett was assigned the role of surveillance in the Enterprise-Chancellor area, starting in or about February 2010. A Title III wiretap had previously authorized law enforcement to monitor the telephone of a co-defendant, Juan Garcia, who had been identified as a participant in the alleged drug trafficking organization. When the wiretap yielded relevant information, Thompson would call Martin, and Martin would call Inabinett. During the course of the wiretap, Inabinett was dispatched on surveillance several times a week.

In the course of his surveillance duties, Inabinett observed what he described as a distinctive gold color Jeep Cherokee, with "nice rims" and a "26 county [Dale County] tag," on several occasions. He first saw the vehicle briefly at a Mexican restaurant in Daleville. He also noticed it parked in the front yard of co-defendant Juan Garcia's house. On another occasion, Inabinett observed the vehicle at the Enterprise Medical Center. He was stationed there because Martin informed him that Martin had just received information that Garcia and someone called "Neya" (Zeneida Miranda) – a Hispanic female who had been identified as a member of the drug trafficking organization – were going to meet at the hospital where Yasmin, Juan's wife or girlfriend, was supposed to be having a baby. While Inabinett watched, he saw Garcia's red Chevy Tahoe pull up and recognized Garcia in the vehicle. A few minutes later, the gold Jeep Cherokee entered the parking lot. The Jeep traveled out of view, and Inabinett could not see who was driving it, but he was told that Neya was the driver. A short time later two Hispanic females came from the parking lot into the hospital.

Inabinett observed the gold Jeep on another occasion at the "LaPrilla" (La Parilla) Mexican restaurant in Dothan. Agents believed, based on wiretap information, that Juan Garcia planned to make a delivery of methamphetamine in Dothan, and Inabinett was asked to set up surveillance on Garcia once the agents thought that the delivery was complete. Inabinett began surveillance and, after watching Garcia arrive at La Parilla, saw the gold Jeep pull up and park two spaces from Garcia's truck a short time later. A Hispanic female got out of the Jeep. She met Garcia and his other passengers (who were children), and they all went inside the restaurant together. When they came out, the same female, whom Inabinett believed to be Neya, returned to the driver's seat of the Jeep. Meanwhile, Garcia got the children situated in his truck and then walked over to the passenger side of the Jeep, opened the door, and had a short conversation with Neya. Both vehicles left the parking lot.

Several other officers participating in the surveillance followed Garcia, while Inabinett followed the Jeep. Approximately three to four minutes from the time that the vehicles departed the restaurant, agents intercepted a phone call between Garcia and another alleged participant in the conspiracy, Jose Mancilla (known as "Boli"). Inabinett was informed that, during the call, Garcia said something to the effect of, "You got to see it. It looks good. Everything's good. I'll talk to you later." Inabinett's understanding of the hierarchy of the alleged drug trafficking organization was that Neya was a source of supply for Garcia. He believed that, during the brief encounter in Neya's Jeep, Neya had either shown or given Garcia a sample of methamphetamine.

On March 25, 2010, Inabinett was assigned to conduct surveillance on Juan Garcia's

residence in Chancellor, Alabama, beginning at 6:30 a.m. Neill Thompson had previously obtained a search warrant for Garcia's residence, which agents expected to serve around 7:30 or 8:00 a.m. Three other search warrants were to be served in Alabama, as well as one in North Florida, that same morning. In addition, Thompson had secured arrest warrants for Juan Garcia, Yasmin Garrison, Neya.(Zeneida Miranda), and Boli (Jose Mancilla).

Inabinett began surveillance on Garcia's home as scheduled. While he was stationed in his vehicle, Inabinett learned that the Florida search warrant had been executed.[1] He was informed that when the agents executed the search warrant, they found a metal ammunition can containing methamphetamine on a trail behind the house, which suggested that someone may have run away as they tried to make entry. Inabinett became concerned that if a member of the alleged drug trafficking organization had run from the house, he or she might get on the phone and alert everyone else that the police were coming. The agents could lose the element of surprise and, at the other homes to be searched, the alleged conspirators might "have time to fortify the house or just be sitting there ready for us to pick us off, one by one."

As Inabinett continued surveillance, he saw the gold Jeep pull up to the front of the house, sometime before 7 a.m. Inabinett, whose vehicle was parked behind the trailer, drove around in front of the trailer and saw a man getting out of the driver's seat and a female trying to get out of the passenger seat of the Jeep. Inabinett could not see who these individuals were, but he believed that the passenger, who had her back turned to him, was

---

[1] Sometime later, Inabinett learned that Garcia was at the Florida residence when the search warrant was executed, and that he was arrested there.

Neya. Inabinett drove past the house, and saw the two individuals walking toward the front door of the trailer. They stayed inside for no longer than two minutes, then returned to the vehicle and left, headed toward Enterprise.

Inabinett informed Andy Martin – who also knew that Neya drove the gold Jeep – of this development, and asked whether or not he should stop the vehicle. Martin said that he would call Thompson, then called back and told Inabinett to make the traffic stop. According to Thompson's testimony, he ordered the Jeep to be stopped because it had been associated with Neya or Zeneida Miranda, she had been identified as a possible source of supply for Garcia, and Thompson had obtained a warrant on the previous day for her arrest.[2]  Inabinett complied with Thompson's instruction and pulled the Jeep over. Inabinett testified that he stopped the vehicle because he was told to do so; in addition, he knew that there was a female in the Jeep and that Neya had an outstanding arrest warrant. Furthermore, Inabinett thought that the visit looked suspicious because it occurred at 6:30 a.m., the two visitors were inside the home for only a few minutes, they potentially were members of a drug organization, and they could have been alerted by another member of the conspiracy when the search warrant was served in Florida. Inabinett thought that the visitors might be moving evidence out or "getting gone."

As a result of the traffic stop, agents seized approximately $10,000 in cash in the

---

[2] Defendants contend that Inabinett had a blanket order to stop any vehicle leaving the residence. While Inabinett did not recall such an order, Thompson confirmed in his testimony that all vehicles at the residence were to be stopped upon leaving, but explained that this was because the three vehicles known to be at the residence, including the Jeep, were "associated with ... targets of the investigation, people who had warrants on them."

possession of defendants Miranda-Garcia and Mendoza, who turned out to be the occupants of the gold Jeep. In a subsequent search, agents seized "facsimile" methamphetamine (made from a cutting agent known as MSM), foil-lined cookie sheets containing MSM, an empty MSM canister, digital scales, and assorted papers from their residence.

## Discussion

Since its ruling in <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), the Supreme Court has consistently recognized that "a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further."<u>Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt County</u>, 542 U.S. 177 (2004) (citations omitted). "To ensure that the resulting seizure is constitutionally reasonable, a <u>Terry</u> stop must be limited. The officer's action must be justified at its inception, and ... reasonably related in scope to the circumstances which justified the interference in the first place." <u>Id.</u> (citation and internal quotation marks omitted).

The reasonableness standard requires an officer to be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion. <u>United States v. Pruitt</u>, 174 F.3d 1215, 1219 (11th Cir. 1999). Reasonable suspicion is determined from the totality of the circumstances, and from the collective knowledge of the officers involved in the stop. <u>Id.</u> Reasonable suspicion must be more than an inchoate hunch; the Fourth Amendment requires that police articulate some minimal, objective justification for an investigatory stop. <u>Id</u>

6

An officer may stop and question a person not only if there are reasonable grounds to believe that he or she may be currently involved in criminal activity, but also if there are reasonable grounds to believe that the person is wanted for past criminal conduct. See United States v. Hensley, 469 U.S. 221, 229 (1985) ("[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a Terry stop may be made to investigate that suspicion."); see also United States v. Cortez, 449 U.S. 411, 417, n. 2 (1981); United States v. Roper, 702 F.2d 984, 989 (11th Cir. 1983); United States v. Johnson, 2010 WL 2271152, 2 (M. D. Ala. 2010). A warrant for the arrest of the occupant of a vehicle supports a reasonable suspicion that the occupant engaged in past criminal activity. See United States v. Cotton, 721 F.2d 350, 351 (11th Cir. 1983) (Officer conducting a Terry stop was aware that a warrant was outstanding for defendant's arrest); Johnson, 2010 WL 2271152 at 2 (same).

In the instant case, agent Inabinett correctly believed that a warrant had been issued for the arrest of Zeneida Miranda ("Neya"), but incorrectly assumed that Neya was a passenger in the gold Jeep at the time of the stop. However, "[a] traffic stop based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth Amendment.... Thus, if an officer makes a traffic stop based on a mistake of fact, the only question is whether his mistake of fact was reasonable, and great deference is given to the judgment of the officer." United States v. Garcia, 284 Fed.Appx. 791, 793 (11th Cir. 2008)(citation and internal quotation marks omitted); see also United States v. Moody, 240

Fed.Appx. 858, 859 (11ᵗʰ Cir. 2007) ("We have indicated that a stop may be valid, even if it was based on an officer's mistake of fact, as long as the mistake was reasonable."); United States v. Chanthasouxat, 342 F.3d 1271, 1276 (11th Cir. 2003) ("A traffic stop based on an officer's incorrect but reasonable assessment of the facts does not violate the Fourth Amendment."). As the Supreme Court explained in Illinois v. Rodriguez, 497 U.S. 177 (1990), "in order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government – whether the magistrate issuing a warrant, the police officer executing a warrant, or the police officer conducting a search or seizure under one of the exceptions to the warrant requirement – is not that they always be correct, but that they always be reasonable." Id. at 185.

Here, Inabinett's mistake of fact concerning Neya's presence in the gold Jeep was reasonable, given Neya's well-established association with the vehicle, Inabinett's observation of a female exiting the Jeep, and the appearance of the vehicle at the home of Garcia, for whom agents believed Neya was a source of supply. Under the totality of the circumstances, the agents collectively possessed a reasonable suspicion that Neya was in the Jeep and that she was wanted in connection with a completed felony. In addition, Inabinett had reasonable grounds to believe that the occupants of the Jeep might currently be involved in criminal activity. Based on the collective knowledge of all the agents involved (including information gathered from the wiretap and months of surveillance, as well as the agents' knowledge of the search and arrest warrants issued for participants in the suspected drug

8

trafficking organization), there was more than an inchoate hunch that Neya and/or other members of the organization would be found in the Jeep; that those individuals might have been alerted concerning the Florida search; and that their unusual 6:30 a.m. visit to the home of a known drug trafficker for whom agents held arrest and search warrants, in a vehicle associated with another suspected drug trafficker for whom an arrest warrant had been issued, might be for the purpose of moving evidence or conducting other criminal activity. Thus, under the totality of the circumstances, agent Inabinett had a particularized and objective basis for stopping the gold Jeep Cherokee. The investigative stop did not violate the Fourth Amendment.

### Conclusion

Accordingly, for the foregoing reasons, it is the RECOMMENDATION of the Magistrate Judge that co-defendants Maria Guadalupe Miranda-Garcia and Leonel Mendoza's motions to suppress (Doc. ## 74, 77) be DENIED.

It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before October 20, 2010. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the

Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done, this 5th day of October, 2010.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE